IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DESHANON HAYWOOD, | ) | CASE NO. 5:19cv1016 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE DAN AARON POLSTER |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| CHAE HARRIS, | ) | JONATHAN D. GREENBERG |
| Warden | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Respondent. | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2.  Before the Court is

the Petition of DeShanon Haywood ("Haywood" or "Petitioner"), for a Writ of Habeas Corpus filed

pursuant to 28 U.S.C. § 2254. Haywood is in the custody of the Ohio Department of Rehabilitation

and Correction at Lebanon Correctional Institute pursuant to journal entry of sentence in the case

*State v. Haywood*, No.  CR2013-05-1404-A.    For  the  following  reasons,  the  undersigned

recommends that the Petition be DENIED.

## I.  Summary of Facts

In a habeas corpus proceeding instituted by a person in custody pursuant to the judgment

of a state court, factual determinations made by state courts are presumed correct unless rebutted by

clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Franklin v. Bradshaw*, 695 F.3d

439, 447 (6th Cir. 2012); *Montgomery v. Bobby*, 654 F.3d 668, 701 (6th Cir. 2011).   The state

appellate court summarized the facts underlying Haywood's conviction as follows:

> [*P2] During the early morning hours of April 18, 2013, four people were murdered
> in the basement of an apartment on Kimlyn Circle in Akron. R.R., one of the victims,
> resided at the apartment and had received a sizeable amount of heroin the night
> before his murder. The three other victims found alongside him were K.W., his
> girlfriend; M.N., a female friend of K.W.; and K.D., a male friend of R.R.'s. The
> police found the apartment in disarray when they arrived on scene and suspected that
> the victims were killed during the course of a robbery and/or burglary. When the
> police obtained R.R.'s cell phone records, they learned that Haywood was the last
> person to call R.R. and brought him in for questioning. The police then later
> examined Haywood's cell phone records and learned that Haywood had received
> incriminating messages from another man, Derrick Brantley, around the time the
> murders were believed to have occurred. Following additional investigation, the
> police arrested both Haywood and Brantley in conjunction with the murders.

> ****

> [*P30] I.L. testified that he was good friends with R.R., one of the victims in this
> matter, and that R.R. went by the nickname "Dutch." R.R. lived in a townhouse-style
> apartment on Kimlyn Circle along with his girlfriend K.W., another one of the
> victims in this matter. I.L. testified that he went to the apartment on the evening of
> April 17, 2013, to spend time with R.R. and several other individuals, one of whom
> was a man named A.T. I.L. acknowledged that he was a heroin dealer at the time and
> that, while at R.R.'s apartment, he made arrangements to purchase 100 grams of
> heroin from a third party in a nearby parking lot. I.L. testified that R.R. knew about
> the transaction and was also a heroin dealer. Before leaving R.R.'s apartment that
> evening, I.L. divided the heroin and gave 30 grams of it to R.R. to sell.

> [*P31] I.L. testified that R.R. was enjoying increasing success as a dealer around the
> time of his murder. Though I.L. supplied R.R. with a sizeable amount of heroin, he
> stated that R.R.'s increasing success caused him concern because he feared that
> someone might try to rob R.R. I.L. testified that, a few days before the murders, he
> gave R.R. a .40 caliber handgun for protection. Not until after R.R.'s murder did I.L.
> learn that R.R. was touting his success on social media. The pictures R.R. posted
> showed him holding substantial amounts of money, and at least one depicted him
> with I.L.'s handgun tucked into his waistband.

> [*P32] I.L. testified that he and R.R. spoke to each other daily. When he tried to call
> R.R. the next day, however, someone else answered R.R.'s cell phone. I.L. then hung
> up and tried again, but another stranger answered. At that point, I.L. became
> concerned and asked his wife to drive him over to R.R.'s apartment. Once there, he

2

found the front door to the apartment open and items strewn about inside. He stated that there were "[c]lothes, shoes, shoeboxes, [and] things everywhere" and that the apartment had not looked that way when he was there the previous evening. I.L. found a bullet casing on the floor in the living room and continued to walk around the apartment until he noticed that the door to the basement was open. He then peeked down the stairs and saw someone's leg at the bottom. In the basement, I.L. found R.R.'s body along with three other bodies. He testified that he recognized K.W. and K.D., a friend of R.R.'s, but that he also saw the body of a female he did not recognize. Once he realized all four individuals were deceased, I.L. left the apartment and contacted the police.

[*P33] A.T. testified that he was at R.R.'s apartment on the evening of April 17th, along with I.L. and several other individuals. He acknowledged that he was a drug dealer at the time and knew that R.R. sold drugs out of his apartment. He maintained, however, that he did not see any drug transactions that evening and, at the time, did not know about the 100 grams of heroin that I.L. bought. A.T. estimated that he spent about an hour or less at R.R.'s apartment before he decided to drive to a nearby dancing club for a few drinks. He testified that he went by himself and stayed for a drink or two before leaving and driving to a different dancing club down the street. He stated that both K.W. and M.N. worked as dancers at the second club and happened to be there that evening.

[*P34] While at the second club, A.T. saw K.R.W., another friend whom he had not seen for some time. He testified that he and K.R.W. shared a few drinks over the course of an hour and that K.W. and M.N. joined them. Eventually, the four decided to go to a restaurant together. A.T. testified that he drove the two women while K.R.W. rode separately in a cab. The group went to a restaurant in Akron where they shared a meal. They paid their bill at 1:40 a.m. on April 18th, as evidenced by a timestamped photograph the State procured from the security footage at the restaurant. After they did so, A.T. drove all four of them to M.N.'s apartment in East Akron.

[*P35] A.T. testified that although K.W. was R.R.'s girlfriend he also had a sexual relationship with her. He testified that, after they arrived at M.N.'s apartment and relaxed a bit, he had sex with K.W. while K.R.W. had sex with M.N. Afterwards, the group relaxed a bit more before A.T. decided to leave. A.T. testified that he offered to drive K.W. home and that she convinced M.N. to come with her. He stated that he was very intoxicated and tired, but drove K.R.W. to a nearby store parking lot to meet his cab before driving both girls back to Kimlyn Circle. A.T. watched as the girls exited the car and approached R.R.'s front door, but left before they went inside. From there, A.T. drove back to his home in Chapel Hill.

[*P36] Not long after A.T. arrived home, K.W. called his cell phone. He testified that K.W. wanted him to drive back to R.R.'s apartment because she and M.N. could not

get inside. A.T. did not leave his home, but spoke with K.W. twice more on the phone. He testified that K.W. described not being able to get inside because Dutch (i.e., R.R.) was "playing" and "act[ing] like he [could not] open the door." The State then asked A.T. whether he had previously testified under oath that it was either Dutch or "Dougie" that K.W. said she saw inside. A.T. eventually agreed that he had testified to that effect, and numerous other witnesses identified Haywood as "Dougie." The State produced evidence that the phone calls between A.T. and K.W. took place at 3:37 a.m., 3:40 a.m., and 3:46 a.m. on April 18th.

[*P37] K.R.W. also testified at trial and confirmed that he spent the evening of April 17th and the early morning hours of April 18th with A.T., K.W., and M.N. Much like A.T., he described how the group unexpectedly met at a dancing club before eating together at a restaurant and going to M.N.'s apartment. He confirmed that he had sex with M.N. at her apartment while A.T. had sex with K.W. He also confirmed that A.T. and the women later dropped him off to meet his cab. K.R.W. testified that he did not speak with A.T. again until the next day when A.T. called. On the phone, A.T. told him that "everybody was dead; they killed the girls and [R.R.] and [K.D.]." A.T. also later told K.R.W. that he had spoken with K.W. after driving her to R.R.'s apartment. According to K.R.W., A.T. told him that K.W. "said she seen either Dutch or Dougie running around" inside the apartment. He specified that he spoke with A.T. several times on the phone and at least once A.T. said it was Dutch, but another time he said it was Dougie that K.W. saw inside. Additionally, K.R.W. testified that both he and A.T. knew about the 100 grams of heroin that had been delivered to R.R.'s apartment the previous evening.

[*P38] The State set forth evidence that Haywood called a man named D.W. during the late evening hours of April 17th and the early morning hours of April 18th. D.W. testified that he was very close with Haywood and also a blood relative of Haywood's significant other. He stated that he was at home when Haywood called and asked him to follow Haywood to an undisclosed location. D.W. acknowledged that he was a drug dealer at the time and that it was not unusual for him to accompany Haywood on trips. He also acknowledged that the car he was driving at the time was not his own, but belonged to a drug user who had loaned it to him in exchange for heroin. D.W. testified that Haywood arrived at his house not long after his phone call and had Brantley in the passenger's seat of his car. D.W. confirmed that he had known Brantley for a long time and was aware that he had a reputation for being a "hothead" as well as for carrying a gun. After Haywood and Brantley arrived, the three departed, with D.W. following behind Haywood's car. D.W. testified that he ultimately parked on Gurley Avenue at Brantley's direction.

[*P39] D.W. testified that he parked his car towards Kimlyn Circle and waited there for a long time while Brantley and Haywood left on foot. During that time, D.W. made and received several phone calls and text messages. The State produced D.W.'s phone records as part of its case-in-chief and the records show that D.W.: (1)

received calls from Haywood's cell phone at 12:11 a.m. and 1:42 a.m.; (2) called Haywood's cell phone at 1:27 a.m., 2:45 a.m., and 2:47 a.m.; (3) received multiple messages and calls from Haywood's significant other between 11:47 p.m. and 2:46 a.m.; (4) received phone calls from two different cell phone numbers linked to Brantley at 2:52 a.m., 3:57 a.m., and 4:12 a.m.; and (5) called one of Brantley's cell phones at 4:15 a.m. and the other at 4:57 a.m. and 6:08 a.m. Detective Robert Moledor, a cellular analysis expert for the State, testified that the calls D.W. made or received between 1:42 a.m. and 4:57 a.m. were all routed through a cell phone tower that serviced the area around R.R.'s apartment. Meanwhile, the call he placed at 6:08 a.m. was routed through a tower that serviced the area around his home.

[*P40] D.W. testified that his cousin, Haywood's significant other, called him several times that evening because she was trying to locate Haywood. He stated that he attempted to call Haywood to tell him that she was looking for him, but never actually succeeded in reaching Haywood when he called. Meanwhile, he indicated that he spoke with Brantley because Brantley called to check that he was still parked outside. D.W. testified that he could not recall speaking with Brantley more than once, although his phone records showed multiple calls between his and Brantley's cell phones.

[*P41] D.W. stated that he eventually saw Haywood and Brantley making their way back to his car at a "fast pace walk." He could not recall what time they returned, but stated that the sun had not yet risen. Once they reached D.W.'s car, Brantley sat down in the front passenger's seat and Haywood sat down in the back. D.W. noticed that Brantley was carrying a bag containing a white substance and was attempting to cover the bag with a t-shirt. The appearance of the substance was consistent with heroin or possibly cocaine, and D.W. estimated that the amount he saw would be worth a few thousand dollars. According to D.W., after Brantley was seated inside the car, he stated that he had "double back[ed]" to "make sure the people were dead" and that he would "take it to his grave." D.W. testified that neither he, nor Haywood responded to Brantley's statements. D.W. then dropped off Haywood and Brantley at a nearby bar and drove home.

[*P42] The State produced a significant amount of testimony in this case from analysts who examined the cell phone records of Haywood, the victims, and many of the individuals who testified. Detective Guy Sheffield examined R.R.'s cell phone and testified that Haywood's cell phone number was saved in its contacts list. He stated that R.R.'s cell phone contained instant messages to and from Haywood's cell phone, dating from February 2013 through April 2013. Within those messages, the two made plans to meet at R.R.'s apartment on Kimlyn Circle and discussed various drug transactions. Detective Sheffield testified that the last stored contact between the two phones took place on April 18th when Haywood's phone called R.R.'s phone at 1:10 a.m.

[*P43] Detective Moledor examined Haywood's cell phone records for content as well as to plot the general location of the phone at the times various calls were either made or received. He testified that calls Haywood's phone made at 1:47 a.m. and 5:01 a.m. were routed through a cell phone tower that served the area around R.R.'s apartment. In between that time period, Haywood's phone received multiple calls and text messages, but the phone was turned off. Detective Moledor was able to conclude the phone was off because it did not download all of the text messages it received during that timeframe until 5:02 a.m., meaning that the device was turned back on at that point. Though Haywood's phone was turned off during that time frame, Moledor testified that he received two particular messages of interest. The first message, sent at 2:10 a.m. from Brantley's phone, read: "kill both these n**gas." The second message, sent at 2:48 a.m. from Brantley's phone read: "I'm bout to shoot Dutch go get da s*** and then I'm gonna kill both des n**gas but u got to hurry up so we can get up out of here."

[*P44] The State produced evidence that Haywood's significant other attempted to contact him 18 times between 1:14 a.m. and 3:27 a.m. on April 18th. Detective Moledor read Haywood's significant other's text messages at trial, all of which expressed her increasing frustration at her inability to locate or hear from Haywood. Detective Moledor testified that Haywood did not respond to the messages until the following afternoon, beginning at 12:17 p.m. At that point, Haywood [***32] sent several messages in which he apologized for not being available the previous evening. One of the messages read: "I know you're mad but * * * I wasn't doing you wrong in no way besides not telling I was gone B out that late I wasn't out enjoying myself * * *."

[*P45] Detective Moledor also examined Brantley's cell phones as part of his investigation. He testified that calls Brantley's phones made between 1:49 a.m. and 4:15 a.m. were routed through a cell phone tower that served the area around R.R.'s apartment. He confirmed that several of those calls were made to or received from the phone number associated with D.W. He also noted that one of the calls that appeared in Brantley's phone records, which occurred at 2:54 a.m., took place between Brantley's two cell phones. That is, one of the cell phones called the other cell phone. Detective Moledor testified that Brantley received a call from Haywood's cell phone at 5:01 a.m. and that call evidenced the fact that Brantley's phone was no longer located in the area of the crime scene. He further testified that, later that same day, Brantley's cell phone received a picture message from Haywood's cell phone. The picture was a screen shot image of an Akron Beacon Journal article about the murders.

[*P46] Dr. Dorothy Dean, the Deputy Medical Examiner for Summit County, autopsied all four of the victims in this matter. She testified that the victims suffered from a number of gunshot wounds, but did not have any other visible injuries. Dr. Dean estimated that the victims died approximately 10 to 12 hours before

6

investigators came on scene, placing their estimated times of death between 2:00 a.m. and 4:00 a.m. on the morning of April 18th. She testified that each of the victims had been shot in the head and that K.W., R.R., and K.D. also had other gunshot wounds. Specifically, K.W. had two other wounds, R.R. had three other wounds, and K.D. had eight other wounds. Dr. Dean was unable to determine the order of the shots or the position of the victims at the time they were shot. She testified that several of the bodies contained bullet fragments or loose bullets, so she collected those in her examination and provided them to law enforcement. A firearms analyst later testified that at least two guns were used to kill the victims. He specified that he examined nine .40 caliber casings that were all fired from the same gun and three .9 millimeter casings that were all fired from a second gun. There is no dispute that the police did not find any guns at the crime scene, including the .40 caliber gun that I.L. gave to R.R. a few days before his murder.

[*P47] Detective Anna Romito, a member of the crime scene unit, testified regarding certain items that the police found at R.R.'s apartment. A shoebox that was located near the basement door contained a small baggy with 1.32 grams of heroin inside it. Another shoebox that the police found on the kitchen counter contained a digital scale and small paring knife while a sandwich bag box that the police found nearby contained a small baggy with .98 grams of heroin inside it. Detective Romito testified that the cabinets in the kitchen were found open and the counter was littered with a variety of items. She stated that other items were also strewn about the apartment and its appearance was consistent with the appearance of burglarized homes she had seen throughout her career. She testified that the police were able to find a fingerprint on the shoebox from the kitchen counter, and a forensic analyst later testified that the fingerprint matched Haywood's left thumbprint.

[*P48] Lieutenant David Whiddon was in charge of the murder investigation here and testified that the police initially interviewed Haywood a few days after the murders because they learned that he was the last person to call R.R. on his cell phone before his murder. At the time, Haywood was serving a few days in jail on an unrelated matter, so the police had him transported to the police station for his interview. During the interview, Haywood indicated that the last time he had been at R.R.'s apartment was perhaps the weekend before the murders occurred. He denied that he was at the apartment on April 17th or April 18th. When the police pressed him for information about who might have committed the murders or who might know something about the murders, Haywood supplied them with A.T.'s nickname and the nickname of a third individual. He never drew their attention to Brantley as a possible culprit. Nevertheless, the State produced evidence that Haywood quickly made attempts to reach Brantley once back at the jail.

[*P49] The State produced evidence that Haywood called his significant other from jail after his interview and that she reached out to Brantley that same afternoon. Haywood's significant other sent Brantley several instant messages that read: (1)

"Dougie told me to call you. Where my baby?? I DON'T appreciate you ignoring me"; (2) "We got to talk"; and (3) "Now they got [R.R.'s] phone?? Your number in there." When Haywood finally spoke with Brantley later that evening he informed him that he had been interviewed about the murders. During the conversation, Brantley specifically asked Haywood where his cell phone was.

\*\*\*\*

[*P65] Next, we address Haywood's contention that the prosecutor improperly commented on his right to remain silent. Haywood testified in his own defense at trial. It was his testimony that he was present at R.R.'s apartment when the murders occurred, but that it was Brantley who committed the murders. While testifying, he admitted that he had an interview with the police a few days after the murders and repeatedly lied baggy with 1.32 grams of heroin inside it. Another shoebox that the police found on the kitchen counter contained a digital scale and small paring knife while a sandwich bag box that the police found nearby contained a small baggy with .98 grams of heroin inside it. Detective Romito testified that the cabinets in the kitchen were found open and the counter was littered with a variety of items. She stated that other items were also strewn about the apartment and its appearance was consistent with the appearance of burglarized homes she had seen throughout her career. She testified that the police were able to find a fingerprint on the shoebox from the kitchen counter, and a forensic analyst later testified that the fingerprint matched Haywood's left thumbprint.

[*P66] On cross-examination, the State asked Haywood whether, when he testified on direct examination, it was the first time anyone in law enforcement had heard the version of events that he described. Haywood agreed that it was the first time and, while he had the opportunity to tell the police the true story, he did not. The State asked Haywood multiple questions about whether, before testifying, he had the benefit of hearing the testimony in prior proceedings, reading the transcript in Brantley's trial, and hearing the State set out its accomplice liability theory. Additionally, the State asked Haywood whether "[f]or two years now, * * * [he] [had] allowed people to accuse [A.T.] of being a murderer[.]" The State also referenced in closing argument the fact that Haywood had lied to the police, had waited more than two years to tell his story, and had only told his story with the benefit of having heard the testimony in the prior proceedings.

*State v. Haywood,* 99 N.E.3d 916, 921, 928-933, 937 (Ohio Ct. App. 2017).

8

## II. Procedural History

**A.     Trial Court Proceedings**

**i.     Indictment**

On June 6, 2013, the Summit County Grand Jury indicated Haywood on the following charges:

- 4 counts of aggravated murder in violation of Ohio Rev. Code § 2903.01(A) (counts 1-4), which carried four death penalty specifications each;

- 9 counts of aggravated murder (felony murder) in violation of Ohio Rev. Code § 2903.01(B) (counts 5-13);

- 4 counts of aggravated robbery in violation of Ohio Rev. Code § 2913.01 (counts 14-17);

- 4 counts of kidnapping in violation of Ohio Rev. Code § 2905.01(A)(2)(3) (counts 18-21);

- aggravated burglary in violation of Ohio Rev. Code § 2911.11(A)(1)(2) (count 22); and

- having weapons while under disability ("WUD") in violation of Ohio Rev. Code § 2923.13(A)(3) (count 23).

Every charge except WUD carried a firearm specification. (Doc. No. 9-1, Ex. 1.) Haywood entered pleas of not guilty to all charges.

**ii.     Pre-trial Motions**[1]

Haywood moved to prohibit the State's use of peremptory challenges to exclude potential jurors who had concerns about imposing the death penalty. (Doc. 9-1, Ex. 2.) The trial court granted the motion "on an individual case basis." (*Id*., Ex. 3.) Haywood also requested that the court adopt

---

[1]  The pre-trial events integral to the claims in this habeas petition are described in detail herein.

9

the standard for death qualified jurors as set forth in Ohio  Rev. Code § 2945.25(C).  (*Id*., Ex. 4.)

The statute forbids the removal of a juror for cause unless "he unequivocally states that under no

circumstances will he follow the instructions of a trial judge and consider fairly the imposition" of

a death sentence. Ohio  Rev. Code § 2945.25(C).  The court granted Haywood's request "to the

extent that it does not impose or constrict the court's discretion." (*Id*., Ex. 5.)

Haywood moved to sever the WUD count.  The trial court denied this motion, but  agreed

that Haywood could have this count tried by the bench eliminating the presentation of any evidence

to the jury on this offense.  (*Id*., Exs. 6-9)

Haywood moved to suppress statements he made to law enforcement when he was serving

a jail sentence on an unrelated matter because Miranda warnings were not provided; and also

evidence taken from his cell phone which was allegedly recovered as a result of the interview. (*Id*.,

Exs. 10, 12.)  The state opposed both of the motions to suppress. (*Id*., Ex. 13.)  The trial court held

two hearings.  (*Id*., Exs. 11, 15.)   The court ultimately ruled that Haywood was not entitled to

Miranda warnings because he was not in custody within the meaning of Miranda.  (*Id*., Ex. 15.)  In

a separate order, the court determined that the information obtained from Haywood's cell phone

through a search warrant would have inevitably been discovered by police by lawful means absent

the allegedly improper interview. (*Id*., Ex. 14.)

Haywood's alleged accomplice, Derrick Brantley, was tried separately, and his trial

concluded before Haywood's trial began.  After a jury recommended a sentence of life without

parole for Brantley, the trial judge unsuccessfully discouraged the prosecutors from seeking the

death penalty for Haywood.  *Haywood,* 99 N.E.3d at 922.

### iii.    Jury selection

At the end of voir dire, the state sought to exercise a peremptory challenge against Juror 18, an African-American, who stated that the death penalty "should never be imposed."  Haywood objected under *Batson v. Kentucky*, 476 U.S. 79 (1986), because Juror 18 was the only African-American juror seated and only six African-Americans were in the jury pool.  Haywood's counsel pointed out that Juror 18 said he could follow the court's instructions, despite his personal feelings. (Doc. No. 9-7 at PageID# 2077-79.)  The trial court sustained the *Batson* challenge, finding that Haywood "was entitled to at least one juror that look[ed] like him," and that the reason for striking Juror 18 was not race-neutral. (*Id*. at PageID# 2080-85.)  The state renewed its motion to strike Juror 18 after other African-American jurors were seated. The court again denied the motion, and Juror 18 remained on the jury. *Haywood*, 99 N.E.3d at 922.

After jury selection was complete, the state requested a continuance to research the possibility of filing an affidavit of disqualification based on the judge's refusal to remove Juror 18 and her pre-trial statements discouraging the state from seeking the death penalty. The state requested that the trial judge refrain from swearing in the jury so that jeopardy would not attach. Haywood objected.   The trial judge initially opposed the delay, but ultimately granted the state's request to delay swearing in the jury until the following day.  (Doc. No. 9-7 at PageID# 2095-102.)

The next day, the state filed an affidavit of disqualification in the Ohio Supreme Court against the trial judge. (Doc. No. 9-1, Ex. 16).  The state based its claim of judicial bias on the judge's pretrial statements urging the prosecutor to remove the death penalty specifications and her denial of a peremptory challenge regarding Juror 18.   Haywood opposed the affidavit of disqualification as untimely. (*Id*., Ex. 17.)  The trial judge responded that she was not biased and

11

should not be disqualified. (*Id*., Ex. 21.)  The matter was never resolved by the Ohio Supreme Court on the merits because the trial judge recused herself and the case was transferred. (*Id*., Ex. 18.)  The Ohio Supreme Court dismissed the affidavit of disqualification as moot based on the voluntary recusal. (*Id*., Ex.  22.)

The new trial judge ordered briefing on the issue of discharging or retaining the selected jury. (*Id*., Exs. 19, 20.) The State moved to quash the initial venire, arguing that the first judge's bias against the death penalty had tainted the jury selection process. (*Id*., Ex. 21.) Haywood opposed discharging the initial venire, claiming that it would violate his rights to a speedy trial and against double jeopardy. (*Id*., Ex. 23.)

The new trial judge determined that he lacked jurisdiction and authority to consider the judicial bias issue which had been delegated exclusively to the Ohio Supreme Court and was curtailed by Ohio R. Crim. P. 25(A). He explained that a review of the jury selection process would be tantamount to deciding the appropriateness of his colleague's rulings, a task which he described as "unprecedented" and exceeding the bounds of his authority. (*Id*., Ex. 24.)  Because he could not "provide a review or remedy" for the potential errors in the jury selection, the second trial judge quashed the jury. (*Id*.)  The judge noted Haywood had waived his speedy trial rights and found double jeopardy was not implicated because the jury had not been sworn in.  (*Id*.)

### iv.    First Trial

A new jury was selected, and the case proceeded to jury trial.  On October 1, 2014, the jury returned its verdict, finding Haywood guilty on all the aggravated murder counts. (*Id*., Ex. 25.)

Before sentencing, Haywood moved for a new trial contending that the state failed to disclose that two of its witnesses received favorable treatment in exchange for their testimony.

*Haywood,* 99 N.E.3d at 922. The parties stipulated to a new trial, and the court vacated Haywood's

convictions and again quashed the jury. (Doc. No. 9-1, Ex. 26.)

On February 19, 2015, at Haywood's request, the court appointed the Cuyahoga County

Prosecutor as special prosecutor.  *Haywood*, 99 N.E.3d at 922.

### v.  Second Trial

A new jury was selected and the case proceeded to trial.  At his second trial, the State

prosecuted Haywood under a complicity theory.  On June 19, 2015,[2] a jury found Haywood guilty

of the following charges:

- •  five counts of aggravated murder with one capital specification (counts 7, 8, 11, 12, and 13),

- •  aggravated robbery (count 14),

- •  two counts of kidnapping (counts 20 and 21), and

- •  aggravated burglary (count 22).

The jury acquitted him of the remaining charges and specifications. (*Id*., Ex. 33.)  The court found

Haywood not guilty of having weapons while under disability.  (*Id*., Ex. 34.)

Haywood moved for a new trial, arguing that the verdicts were inconsistent and the jury

instructions defective.  (*Id*., Exs. 35, 36.)  The court denied his motion. (*Id*., Ex. 37.)

The court held a mitigation hearing, and the jury recommended that Haywood receive life

in prison with the possibility of parole. The trial court sentenced Haywood to life imprisonment with

the possibility of parole after twenty five years for complicity to commit aggravated murder, and ten

years in prison for complicity to commit aggravated robbery and kidnapping, for a total prison term

---

[2]  The judgment was entered on July 2, 2015. (Doc. No. 9-1, Ex. 33.)

of thirty five years to life. (*Id*., Exs. 38, 39, 40).

**B.**     **Direct Appeal**

Haywood, through counsel, filed a timely notice of appeal to the Ninth District Court of

Appeals.   In his appellate brief, he raised the following assignments of error:

I.      Prosecutorial misconduct deprived DeShanon Haywood of his due-process, fair-trial, and double-jeopardy rights. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Sections 10 and 16, Article I, Ohio Constitution.   Aug. 6, 2014 Journal Entry; First Trial Tr. 2323-2389; Oct. 16 2014 Motion Hearing Tr. 2-25 Oct. 17,2014 Motion Hearing Tr. 2-19.

II.      The trial court abused its discretion when it quashed the first death qualified and lawfully-selected jury. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Sections 10 and 16, Article I, Ohio Constitution. Aug. 6, 2014 Journal Entry.

III.     The trial court abused its discretion when it delayed impaneling the first death-qualified and lawfully-selected jury. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Sections 10 and 16, Article I, Ohio Constitution. First Trial Tr. 2340-2347.

IV.     The trial court abused its discretion when it delayed impaneling the first death-qualified and lawfully-selected jury. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Sections 10 and 16, Article I, Ohio Constitution. First Trial Tr. 2340-2347.

V.      The trial court erred in denying DeShanon Haywood's Crim. R. 29 motion for acquittal, and violated his due-process and fair-trial rights when it entered convictions in the absence of sufficient evidence. Fifth and Fourteenth Amendments, United States Constitution; Sections 10and 16, Article I, Ohio Constitution. Aug. 6, 2014 Journal Entry; Third Trial Tr. 4654-4697, 4796-4843.

VI.     DeShanon Haywood's constitutional rights to counsel and against self-incrimination were violated when the trial court admitted his in custody, non-Mirandized statements. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Sections 10 and 16, Article I, Ohio Constitution. July 21, 2014 Order; Third Trial Tr. 4004, 4068.

VII.    Prosecutorial misconduct deprived DeShanon Haywood of his due

14

process and fair-trial rights. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Sections 10 and 16, Article I, Ohio Constitution. Third Trial Tr. 4440, 4441, 4521,4523, 4547,4562,4595-4596.

VIII.    The trial court abused its discretion when it admitted inadmissible hearsay testimony and permitted improper impeachment related to that testimony. Evid. R. 803(1); Evid. R. 607. Fifth and Fourteenth Amendments, United States Constitution; Sections 10 and 16, Article I, Ohio Constitution. Third Trial Tr. 2869-2881, 4835-4836.

IX.    The trial court erred and violated DeShanon Haywood's due-process and fair-trial rights when it entered convictions that were against the manifest weight of the evidence. Fifth and Fourteenth Amendments, United States Constitution; Sections 10 and 16, Article I, Ohio Constitution. Third Trial Tr. 4654-4697, 4796-4843.

X.    The trial court violated DeShanon Haywood's due-process and fair trial rights through cumulative error. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Sections 10 and 16, Article I, Ohio Constitution. July 21, 2014 Order; July 29, 2014 Transfer Entry; Aug. 6, 2014 Journal Entry; First Trial Tr. 2323- 2389; Oct. 16, 2014 Motion Hearing Tr. 2-25; Oct. 17, 2014 Motion Hearing Tr. 2-19; Third Trial Tr. 2869-2881, 4004, 4068,4440,4441, 4521,4523,4547,4562, 4595-4596, 4654-4697, 4796-4843.

(*Id*., Exs. 46, 49). The State filed a brief in response. (*Id*., Ex. 50.)  Haywood replied. (*Id*., Ex. 51.)

On October 25, 2017, the state appellate court affirmed Haywood's convictions. *Haywood*, 99 N.E.3d 916.

On January 16, 2018, Haywood, with the assistance of his appellate counsel filed a Notice of Appeal with the Supreme Court of Ohio.  (*Id*., Exs. 57-58.)   In his Memorandum in Support of Jurisdiction, Haywood  raised the following Propositions of Law:

I.    Qualified fully-selected juries may not be dismissed unless the reason for dismissal is decided on the merits. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution.

II    A lone judicial ruling, even when incorrect, is not sufficient to

15

demonstrate judicial bias. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution.

III.    When prosecutorial misconduct prevents the impaneling of a fully selected jury, due process and double jeopardy prohibit a new trial. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution.

IV.    A forced, police-station questioning of an incarcerated person regarding events unrelated to the incarceration  that includes a compelled DNA collection, is a custodial interrogation that requires Miranda warnings. Fifth, Sixth, and Fourteenth Amendments, United States Constitution; Article I, Sections 10 and 16, Ohio Constitution.

(*Id*.)  The State filed a response.  (*Id*., Ex. 59.)

On May 9, 2018, the Supreme Court of Ohio declined to accept jurisdiction of the appeal pursuant to S. Ct. Prac. R. 7.08(B)(4).  *State v. Haywood*, 152 Ohio St. 3d 1465, 97 N.E.3d 501 (Table) (Ohio 2018).

## C.    Federal Habeas Petition

On May 1, 2019, Haywood, through his appellate counsel, filed a Petition for Writ of Habeas Corpus ("Petition") in this Court and asserted the following grounds for relief:

> **GROUND ONE**: DeShanon Haywood's due-process, double-jeopardy, and fair-trial rights were violated through prosecutorial misconduct related to, and judicial exclusion of, the fully qualified and selected jury.

> > **Supporting Facts**:  A fully qualified and selected jury was excluded through State fabricated judicial-bias claims related to the trial court's ruling on a *Batson* challenge. The State exercised a peremptory on a juror. Mr. Haywood raised a *Batson* challenge. The trial court sustained Haywood's *Batson* challenge and the State-peremptory-challenged juror remained on the fully selected jury. The State raised a judicial-bias claim to the Supreme Court of Ohio. The trial court delayed impaneling the jury and voluntarily recused itself from the bias-claim process, which prohibited a merits decision. The fully qualified and selected jury was excluded from hearing the case by a new trial court.

16

**GROUND TWO**:      DeShanon Haywood's rights to counsel and against
self-incrimination were violated through a non-*Mirandized* custodial interrogation.

> **Supporting Facts**:  Police mandated and facilitated questioning
> of Haywood regarding a quadruple homicide while he was jailed
> on unrelated charges, transported him from jail to a police-station
> interrogation room, and compelled DNA extraction from Haywood
> during the interview without providing Miranda warnings. The
> statements that Haywood provided during that non-*Mirandized*,
> custodial interrogation were used against Haywood at trial in both
> the State's case-in-chief, and to impeach Haywood during his
> testimony. The content of the interview prejudiced Haywood
> because it contained numerous statements that Haywood later
> admitted were not truthful.

(Doc. 1.)

On July 10, 2019, Warden Chae Harris ("Respondent") filed his Return of Writ. (Doc. No.

9.)  Haywood filed a Traverse on September 17, 2019.  (Doc. No. 19.)

### III.  Exhaustion and Procedural Default

**A.      Legal Standard**

Petitioners must exhaust their state remedies prior to raising claims in federal habeas corpus

proceedings.  *See* 28 U.S.C. § 2254(b), (c).  This requirement is satisfied "when the highest court

in the state in which the petitioner was convicted has been given a full and fair opportunity to rule

on the petitioner's claims."  *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990).

Federal courts will not consider the merits of procedurally defaulted claims, unless the

petitioner demonstrates cause for the default and prejudice resulting therefrom, or where failure to

review the claim would result in a fundamental miscarriage of justice.  *See Lundgren v. Mitchell*,

440 F.3d 754, 763 (6th Cir. 2006) (citing *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 53

L.Ed.2d 594 (1977)).  A claim may become procedurally defaulted in two ways.  *Id.*  First, a

17

petitioner may procedurally default a claim by failing to comply with state procedural rules in presenting his claim to the appropriate state court. *Id.; see also Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). If, due to petitioner's failure to comply with the procedural rule, the state court declines to reach the merits of the issue, and the state procedural rule is an independent and adequate grounds for precluding relief, the claim is procedurally defaulted.[3] *Id.*

Second, a petitioner may also procedurally default a claim by failing to raise and pursue that claim through the state's "ordinary appellate review procedures." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999). If, at the time of the federal habeas petition, state law no longer allows the petitioner to raise the claim, it is procedurally defaulted. *Engle v. Isaac,* 456 U.S. 107, 125 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); *see also Coleman v. Thompson*, 501 U.S. 722, 731 32, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Lovins*, 712 F.3d 283, 295 (6th Cir. 2013) ("a claim is procedurally defaulted where the petitioner failed to exhaust state court remedies, and the remedies are no longer available at the time the federal petition is filed because of a state procedural rule.") This second type of procedural default is often confused with exhaustion. Exhaustion and procedural default, however, are distinct concepts. AEDPA's exhaustion

---

[3] In *Maupin*, the Sixth Circuit established a four-step analysis to determine whether a claim is procedurally defaulted. 785 F.2d at 135. Under this test, the Court decides (1) whether the petitioner failed to comply with an applicable state procedural rule, (2) whether the state courts actually enforced the state procedural sanction, (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and (4) whether the petitioner has demonstrated "cause" and "prejudice." *Id.* at 138 39; *Barkley v. Konteh*, 240 F. Supp. 2d 708 (N.D. Ohio 2002). "In determining whether a state court actually enforced a procedural rule, we apply the 'plain statement' rule of *Michigan v. Long*, 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)." *Lovins v. Parker*, 712 F.3d 283, 296 (6th Cir. 2013) ("a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar.") (citations omitted).

requirement only "refers to remedies still available at the time of the federal petition." *Engle*, 456 U.S. at 125 n.28.  Where state court remedies are no longer available to a petitioner because he failed to use them within the required time period, procedural default and not exhaustion bars federal court review.  *Id*.  In Ohio, a petitioner is not entitled to raise claims in post-conviction proceedings where those claims could have been raised on direct appeal.  *Id.*  Thus, if an Ohio petitioner failed to raise a claim on direct appeal, which could have been raised, the claim is procedurally defaulted. *Id.*

A claim is adequately raised on direct appeal if it was "fairly presented" to the state court. To fairly present a claim to a state court a petitioner must assert both the legal and factual basis for his claim.  *See McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000).  Accordingly, a "petitioner must present his claim to the state courts as a federal constitutional issue-not merely as an issue arising under state law." *Koontz v. Glossa*, 731 F.2d 365, 368 (6th Cir. 1984).  A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented as a federal constitutional claim: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.  *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006).

A petitioner's procedural default, however, may be excused upon a showing of "cause" for the procedural default and "actual prejudice" from the alleged error.  *See Maupin*, 785 F.2d at 138 39. "Demonstrating cause requires showing that an 'objective factor external to the defense impeded counsel's efforts to comply' with the state procedural rule." *Franklin v. Anderson*, 434

F.3d 412, 417 (6th Cir. 2006) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Meanwhile, "[d]emonstrating prejudice requires showing that the trial was infected with constitutional error." *Id.*  Where there is strong evidence of a petitioner's guilt and the evidence supporting petitioner's claim is weak, the actual prejudice requirement is not satisfied.  *See United States v. Frady*, 456 U.S. 152, 172, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982); *Perkins v. LeCureux*, 58 F.3d 214, 219  20 (6th Cir. 1995); *Rust v. Zent*, 17 F.3d 155, 161-62 (6th Cir. 1994).  Prejudice does not occur unless petitioner demonstrates "a reasonable probability" that the outcome of the trial would have been different.  *See Mason v. Mitchell*, 320 F.3d 604, 629 (6th Cir. 2003) (citing *Strickler v. Greene*, 527 U.S. 263, 289, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

Finally, a petitioner's procedural default may also be excused where a petitioner is actually innocent in order to prevent a "manifest injustice."  *See Coleman v. Thompson*, 501 U.S. 722, 749  50, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991).  Conclusory statements are not enough  a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial."  *Schlup v. Delo*, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995).  *See also Jones v. Bradshaw*, 489 F. Supp. 2d 786, 807 (N.D. Ohio 2007); *Allen v. Harry*, 497 F. App'x 473, 480 (6th Cir. 2012).

**B.      Application to Petitioner - Ground Two**

Respondent asserts that the second ground of Haywood's Petition is procedurally defaulted because he failed to fairly present these claims before the state appellate court.  (Doc. No. 9 at 44.) He notes that the state appellate court declined to address Haywood's *Miranda* claims because it deemed his brief procedurally defective under Ohio R. App. P. 16(A)(7) and 12(A)(2) for failing to

identify specific inculpatory statements or explain how the court's ruling prejudiced him. (*Id*. at 43.)

Haywood responds that his "appellate brief and reply brief not only 'fairly presented' the *Miranda* claim but fully satisfied Ohio R. App. P. 16(A)(7) and 12(A)(2)." (Doc. No. 19 at 8.) He argues that because all non-*Mirandized* statements obtained through a custodial interrogation are inadmissible unless deemed harmless, a *Miranda* challenge inherently attacks all statements made during the challenged interrogation.(Doc. No. 19 at 8-9.) He asserts that " it is clear from the [state appellate court] merit brief and reply brief that, as in the trial court, the entire interrogation was being challenged." (*Id*.) Therefore, he argues that "the state appellate court's requirement that specific inculpatory statements be identified is incompatible with the governing constitutional protection." (*Id*. at 9.) Further, he notes that he timely applied for reconsideration and replied to the State's response regarding reconsideration. (*Id*. at 10, citing PageID # 1351-1394, 1402-1408.)

The state appellate court addressed this issue as follows:

> [*P25] It is undisputed that, early in their investigation, the police identified Haywood as a person of interest and interviewed him while he was in jail on an unrelated matter. At no point during the interview did the police Mirandize him. According to Haywood, his rights were violated when the trial court admitted his "in custody, non-*Mirandize*d statements." Yet, he "has not identified the statements which he believes were obtained in violation of his rights and has not pointed to the portions of the record on which [his] assignment of error is based." *State v. Tuck*, 146 Ohio App.3d 505, 510, 2001-Ohio-7017, 766 N.E.2d 1065 (9th Dist.2001). His brief only addresses the question of custodial interrogation; not any prejudice that ensued as a result of his having made certain, inculpatory statements. Because Haywood has not pointed this Court to any inculpatory statements or explained how the court's ruling prejudiced him, this Court will not address his argument that he was subjected to custodial interrogation. *See State v. Jenkins*, 9th Dist. Lorain No. 15CA010826, 2016-Ohio-5190, ¶ 14; *Tuck* at 510. Haywood's sixth assignment of error is overruled.

*Haywood*, 99 N.E.3d at 927.

Ohio Rule of Appellate Procedure 16(A)(7) provides in pertinent part that "[t]he appellant

shall include in its brief . . . [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the . . . parts of the record on which the appellant relies."  Under Ohio Rule of Appellate Procedure 12(A)(2), the court of appeals is expressly permitted to "disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App. R. 16(A)."

The assignment of error in Haywood's appellate brief identified the issue as follows: "DeShanon Haywood's constitutional rights to counsel and against self-incrimination were violated when the trial court admitted his in custody, non-*Mirandized* statements." (Doc. No. 9-1, Ex. 49 at PageID #1213.) He cited the trial court's July 21, 2014 Order, which denied the suppression request and "recognized that the entire interrogation was being challenged," as well as the pinpoint transcript cites where defense counsel reaffirmed the suppression request during the third trial. (Id. at PageID #1217.)

Haywood's argument challenges the first prong of the *Maupin* test: that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. *Maupin,* 785 F.2d at 138.  He does not dispute the existence or relevance of Ohio Rules of Appellate Procedure 12(A)(2) or 16(a).  However, he asserts that the state appellate court twice erred in applying these rules: first, in its ruling on his motion for appeal, and again in its denial of his motion for reconsideration.  (Doc. No. 19 at 10.)  He asks this court to substitute its judgement for that of the state appellate court in applying the relevant Ohio Rules of Appellate Procedure.  He cites  the  United  States  Supreme  Court  decision  in  *Cone  v.  Bell,*  in  which  the  Tennessee

postconviction court denied a petitioner's Brady claim, because it concluded the claim been previously determined following a full and fair hearing in state court.  *Cone v. Bell*, 556 U.S. 449, 466, 129 S. Ct. 1769, 1780, 173 L. Ed. 2d 701 (2009).  The court found that this denial was based on "a false premise: Contrary to the state courts' finding, *Cone* had not presented his Brady claim in earlier proceedings, and, consequently, the state courts had not passed on it."  *Id*.  The *Cone* court explained:

> When a state court declines to find that a claim has been waived by a petitioner's alleged failure to comply with state procedural rules, our respect for the state-court judgment counsels us to do the same. Although we have an independent duty to scrutinize the application of state rules that bar our review of federal claims, *Lee*, 534 U.S., at 375, 122 S.Ct. 877, we have no concomitant duty to apply state procedural bars where state courts have themselves declined to do so. The Tennessee courts did not hold that Cone waived his *Brady* claim, and we will not second-guess their judgment

*Id.*, 556 U.S. at 468 69.  Therefore, Haywood urges this court find the second ground of his petition is not procedurally defaulted and should be addressed *de novo*.

Unlike the situation in *Cone*, however, in this case the state appellate court was clear in its determination that Haywood's *Miranda* claim had been waived by his failure to follow the state procedural rules at issue.  Although Haywood's appellate brief did specifically cite portions of the record describing the conditions of the police interview that Haywood believed demonstrated it should be considered an interrogation under *Miranda,* the state appellate court accurately observed that it did discuss the content of that interview at all,[4] and did not identify any specific statements from that interview which he perceived as obtained in violation of his Constitutional rights.  His

---

[4]  The closest the assignment of error comes to addressing the content of the interview is the bare statement that "Mr. Haywood did not confess."  (Doc. No. 9-1, Ex. 49 at PageID # 1219.)

23

argument focused solely on the conditions of this interview, and omitted any discussion of its content.  Further, he cites no authority for the proposition that this satisfies the relevant Rules of Appellate Procedure.  Therefore, the deference due to state court applications of state procedural rules compels this court to defer to the state appellate court's determination that Haywood's appellate pleadings did not satisfy Ohio Rules of Appellate Procedure 12(A)(2) and 16(a), and the first ground of his Petition is procedurally defaulted.[5]

The Court can still consider Haywood's constitutional arguments if it determines that this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent . . ." *Murray v. Carrier*, 477 U.S. 478, 485, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). The Sixth Circuit Court of Appeals explained that the "actual innocence" exception applies to a petitioner who submits new evidence showing that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Williams v. Bagley*, 380 F.3d 932, 973 (6th Cir. 2004), *quoting Schlup v. Delo*, 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), quoting *Murray*, 477 U.S. at 496. The Sixth Circuit held that "[t]o establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.*  In his Petition, Haywood presents no new evidence to carry this burden.

---

[5]  It is undisputed that Ohio App. R. 16(A)(7) is an adequate and independent ground of decision. *See, e.g., Campbell v. Bunting*, No. 1:14CV1187, 2015 WL 4984871, at *2 (N.D. Ohio Aug. 19, 2015);  *Boynton v. Sheets*, No. 1:11cv2810, 2013 WL 1742711, *11 (N.D. Ohio Mar. 5, 2013), *report and recommendation adopted*, 2013 WL 1747717 (N.D. Ohio Apr. 23, 2013); *Johnson v. Bradshaw*, No. 1:03cv2509, 2006 WL 2945915, *9  *10 (N.D. Ohio Oct. 13, 2006).

## IV.  Review on the Merits

**A.**     **Legal Standard**

This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The

relevant provisions of AEDPA state:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable
> > application of, clearly established Federal law, as determined by the
> > Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination
> > of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (1996).

Clearly established federal law is to be determined by the holdings (as opposed to the dicta)

of the United States Supreme Court.  *See Parker v. Matthews*, 567 U.S. 37, 132 S.Ct. 2148, 183

L.Ed.2d 32 (2012); *Renico v Lett*, 559 U.S. 766, 130 S.Ct. 1855, 1865-1866 (2010); *Williams v.

Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Shimel v. Warren,* 838 F.3d

685, 695 (6th Cir. 2016); *Ruimveld v. Birkett*, 404 F.3d 1006, 1010 (6th Cir. 2005).  Indeed, the

Supreme Court has indicated that circuit precedent does not constitute "clearly established Federal

law, as determined by the Supreme Court."  *Parker*, 567 U.S. at 48-49; *Howes v. Walker*, 567 U.S.

901, 132 S.Ct. 2741, 183 L.Ed.2d 612 (2012).  *See also Lopez v. Smith*, 574 U.S. 1, 7, 135 S.Ct. 1,

4, 190 L.Ed.2d 1 (2014) (per curiam) ("Circuit precedent cannot 'refine or sharpen a general

principle of Supreme Court jurisprudence into a specific legal rule that this Court has not

25

announced.' " (quoting *Marshall v. Rodgers*, 569 U.S. 58, 133 S.Ct. 1446, 1450, 185 L.Ed.2d 540 (2013))).

A state court's decision is contrary to clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. at 413.  By contrast, a state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*.  *See also Shimel*, 838 F.3d at 695.  However, a federal district court may not find a state court's decision unreasonable "simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly." *Williams v. Taylor,* 529 U.S. at 411.  Rather, a federal district court must determine whether the state court's decision constituted an objectively unreasonable application of federal law.  *Id.* at 410-12.  "This standard generally requires that federal courts defer to state-court decisions." *Strickland v. Pitcher*, 162 F. App'x 511, 516 (6th Cir. 2006) (citing *Herbert v. Billy*, 160 F.3d 1131, 1135 (6th Cir. 1998)).

In *Harrington v. Richter*, 562 U.S. 86, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011), the Supreme Court held that as long as "fairminded jurists could disagree on the correctness of the state court's decision," relief is precluded under the AEDPA.  *Id.* at 786 (internal quotation marks omitted).  The Court admonished that a reviewing court may not "treat[ ] the reasonableness question as a test of its confidence in the result it would reach under *de novo* review," and that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable.'" *Id*. at 785.  The Court

noted that Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems" and does not function as a "substitute for ordinary error correction through appeal."  *Id*. (internal quotation marks omitted).  Therefore, a petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 786 87.  This is a very high standard, which the Supreme Court readily acknowledged.  *See id.* at 786 ("If this standard is difficult to meet, that is because it is meant to be.").

### 1.  Ground One

In the first ground of his Petition, Haywood asserts that his due-process, double jeopardy, and fair-trial rights were violated through prosecutorial misconduct related to, and judicial exclusion of, the fully qualified and selected jury.  (Doc. No. 1 at 5.)  He argues that, although the continuance was reasonable, the failure of both the first and second trial judges to impanel the first jury when the continuance ended violated Haywood's Constitutional rights.  (Doc. No. 19 at 5-6.)

The Respondent contends that these allegations were properly dismissed by the state appellate court.  He asserts that the state appellate court reasonably concluded that neither the State's request for a continuance nor the trial judge's decision to grant it deprived Haywood of due process of law, and notes that the state appellate court found that the prosecutors' judicial bias claims were based on record evidence and they pursued them in a proper and expeditious manner.  (Doc. No. 9 at 29-30.)  Further, he argues that  the State's actions did not deprive Haywood of his right against double jeopardy because the jury was not sworn and therefore, jeopardy did not attach.  (*Id*. at 36.)

The Ohio Court of Appeals addressed this issue as follows:

[*P11] Haywood's first three assignments of error all stem from his assertion that this matter ought to have been heard by the first jury that the parties selected. He

argues that the first trial judge abused her discretion when she agreed to delay impaneling that jury. He also argues that the second trial judge abused his discretion when he quashed the first jury without a sound reason for doing so and without considering reasonable alternatives. Finally, he argues that the State engaged in misconduct when it raised unsupported claims of judicial bias and secured the first jury's dismissal. Haywood asks this Court to vacate his convictions and bar his retrial based on violations of his due process and double jeopardy rights. For the reasons that follow, we reject Haywood's arguments.

[*P12] "A trial court may order a mistrial where some intervening error prejudicially affects the merits of the case and the substantive rights of one or both of the parties." *State v. Sutton*, 9th Dist. Medina Nos. 2066, 2067, 1992 Ohio App. LEXIS 2916, *6 (June 3, 1992). Mistrials may be declared during trial or during jury selection, prior to the jury being sworn in. Id. at *5, fn.1. *See also State v. Stambaugh*, 2d Dist. Miami No. 2008 CA 42, 2009-Ohio-7050, ¶ 7-46. [A] trial judge is in the best position to determine whether the situation in [the] courtroom warrants the declaration of a mistrial. In examining the trial judge's exercise of discretion in declaring a mistrial, a balancing test is utilized, in which the defendant's right to have the charges decided by a particular tribunal is weighed against society's interest in the efficient dispatch of justice. "[A] defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Wade v. Hunter*, 336 U.S. 684, 689, 69 S. Ct. 834, 93 L. Ed. 974 (1949). Where the facts of the case do not reflect unfairness to the accused, the public interest in insuring that justice is served may take precedence. (Internal citations and ellipses omitted.) State v. Glover, 35 Ohio St.3d 18, 19, 517 N.E.2d 900 (1988). Because the decision to grant or deny a mistrial lies in a trial court's sound discretion, this Court reviews that decision for an abuse of discretion. *State v. Dickerson*, 9th Dist. Summit No. 22536, 2005-Ohio-5499, ¶ 6.

[*P13] When a trial court acts within its discretion in declaring a mistrial, the Double Jeopardy Clause generally will not bar a retrial. *Glover* at 21. An exception exists and retrial is barred where "the judge's action was instigated by prosecutorial misconduct designed to provoke [the] mistrial * * *." *Id.* In those instances, the Double Jeopardy Clause will not permit a retrial. *State v. Anderson*, 148 Ohio St.3d 74, 2016-Ohio-5791, ¶ 32, 68 N.E.3d 790, *quoting Glover* at syllabus. Yet, jeopardy does not attach in a jury trial "until the jury is impaneled] and sworn." *State v. Gustafson*, 76 Ohio St. 3d 425, 435, 1996-Ohio-299, 668 N.E.2d 435 (1996).

[*P14] The record reflects that Haywood's first jury was not impaneled after voir dire because the first trial judge granted the State's request for a delay in the proceedings. The first trial judge did not declare a mistrial at that point, but simply agreed to preserve the status quo for an evening while the State conducted research and decided whether to file an affidavit of disqualification. In essence, the trial court

28

granted the State's motion for a brief continuance. Haywood argues that it was unreasonable for the court to do so because the State did not have a legitimate basis to request the delay.

[*P15] "[T]he decision to grant or deny a continuance lies within the sound discretion of the trial court * * *." *State v. Bennett*, 9th Dist. Lorain No. 12CA010286, 2014-Ohio-160, ¶ 22. In reaching its decision, the court should consider the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case. *State v. Unger*, 67 Ohio St.2d 65, 67-68, 423 N.E.2d 1078 (1981). The court must balance "'any potential prejudice to a [party against] concerns such as a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice.'" (Alteration sic.) *State v. Sauto*, 9th Dist. Summit No. 26404, 2013-Ohio-1320, ¶ 17, *quoting In re C. G.*, 9th Dist. Summit No. 26506, 2012-Ohio-5999, ¶ 8, quoting Unger at 67.

[*P16] Upon review, we cannot conclude that the first trial judge abused her discretion when she granted the State's request for a continuance. The record reflects that the State sought one very brief delay for the purpose of deciding whether to file an affidavit of disqualification. As support for its request, the State specifically noted its concern that the judge (1) had not allowed it to strike a juror who was morally opposed the death penalty, and (2) had encouraged prosecutors, on two separate occasions, to dismiss the capital specifications against Haywood. The State also specifically noted its concern that its options for redress might be limited if the jury was sworn in and jeopardy was allowed to attach. By affording the State a continuance, the first trial judge gave the State an opportunity to file its affidavit and stay the proceedings so that its concerns could be addressed before the matter proceeded any further. *See* R.C. 2701.03(D)(1) (affidavit of disqualification divests judge of jurisdiction until the Chief Justice rules upon the affidavit). Because this was a death penalty case, the stakes at trial were extremely high for both sides, and any prejudice Haywood suffered as a result of the delay was minimal, given that the judge's ruling merely preserved the status quo for a day. *See Sauto* at ¶ 17. Under these facts and circumstances, it was not unreasonable for the court to permit the continuance out of an abundance of caution.

*Haywood*, 99 N.E.3d at 923-25.

In his Traverse, Haywood argues that the state appellate court and Respondent both

"mischaracterized the salient issue here regarding the failure to impanel the first fully qualified jury

29

as one grounded, in part, in the law of continuances." (Doc. No. 19 at 5.) He concedes that, "[h]ad the first fully qualified jury been impaneled after a reasonable continuance, there would have been no constitutional violation," but asserts is was an abuse of discretion by both trial judges not to impanel  - and ultimately to dismiss - the jury. (*Id*. at 5-6.)  The state appellate court went on to discuss the decision to dismiss the first jury before it was impaneled at length as follows:

[*P17] Because the first trial court judge recused herself before the Chief Justice ruled on the State's affidavit of disqualification, there was never a determination made regarding her alleged bias. Following her recusal, however, the State maintained that her bias had tainted the jury selection process. The State asked the second trial judge to quash the jury that had been selected, and Haywood opposed the State's motion. The second trial judge did not adopt the State's rationale, but ultimately agreed to quash the jury based on the "untenable position" in which he had been placed.  The second trial judge found that he lacked jurisdiction to decide his colleague's alleged bias and, likewise, to judge "as an appellate reviewer" whether she had made appropriate decisions during the jury selection process. Nevertheless, he found that "the integrity of the judicial system" would be placed in jeopardy if he were to proceed with the trial when the case was "so potentially clouded in error." He decided "under these extraordinary circumstances" to err on the side of caution and order the jury selection process to start anew.

[*P18] Haywood argues that the State engaged in misconduct by essentially goading the trial court into declaring a mistrial and quashing the first jury. He argues that the bias claims the State raised were meritless and were asserted strictly to avoid trying the case before a jury it found unfavorable. On a related note, he argues that the second trial judge abused his discretion when he quashed the first jury based on the State's meritless allegations. He asserts that the court failed to undertake a sound reasoning process or to consider reasonable alternatives such as reconfirming the jury in question or replacing Juror 18 with an alternate juror.

[*P19] In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced. *State v. Smith*, 14 Ohio St.3d 13, 14, 14 Ohio B. 317, 470 N.E.2d 883 (1984). "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial." *State v. Knight*, 9th Dist. Lorain No. 03CA008239, 2004-Ohio-1227, ¶ 6, *citing State v. Carter*, 72 Ohio St.3d 545, 557, 1995-Ohio-104, 651 N.E.2d 965 (1995).

[*P20] Much of Haywood's argument is premised on his assertion that the State

30

"fabricated" allegations of judicial bias in this matter. We note that our review of his argument is somewhat hampered because we lack jurisdiction "'to determine a claim that a common pleas judge is biased or prejudiced.'" *Wilburn v. Wilburn*, 169 Ohio App.3d 415, 2006-Ohio-5820, ¶ 10, 863 N.E.2d 204 (9th Dist.), *quoting Jones v. Billingham*, 105 Ohio App. 3d 8, 11, 663 N.E.2d 657 (2d Dist. 1995). As noted below, the authority to make that determination rests exclusively with the Chief Justice. *See State v. O'Neal*, 9th Dist. Medina No. 06CA0056-M, 2008-Ohio-1325, ¶ 15. This Court, therefore, cannot determine whether the first trial judge in this matter was, in fact, biased. Our review is limited to a determination of whether the State engaged in misconduct when it asked the first trial judge not to impanel the jury, filed an affidavit of disqualification, and later moved to quash the jury.

[*P21] The record does not support Haywood's assertion that the State's actions amounted to an attempt to manipulate the proceedings. Regardless of whether the first trial judge was actually biased, the conduct underlying the State's allegations against her is a matter of record. There is no evidence that the State accused the first trial judge of conduct that she did not, in fact, commit. Nor is there evidence that the State's actions amounted to tactical scheming. For instance, the State did not seek repeated continuances, wait until the trial had progressed to seek the judge's removal, file and dismiss one or more affidavits of disqualification, or change its position once the first trial judge recused herself. The State requested a single, brief continuance at the conclusion of voir dire, filed its affidavit of disqualification the very next day, and pursued the matter with the second trial judge after the first judge's recusal. The State's actions, in and of themselves, do not warrant a finding of misconduct. Accordingly, we must conclude that Haywood's prosecutorial misconduct argument lacks merit.

*Haywood*, 99 N.E.3d at 925-26.

### a.    Abuse of Discretion

The selection and qualification of jurors "is a discretionary function of the trial court" and, unless an abuse of discretion is clearly shown, will not constitute ground for reversal.  *Berk v. Matthews,* 559 N.E.2d 1301 (Ohio 1990); citing *Martin v. Martin*, 480 N.E.2d 1112, 1114 (Ohio 1985). The Ohio Supreme Court explained that: "The term 'abuse of discretion' connotes more than an error of law or of judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable."  *State v. Adams,* 404 N.E.2d 144, 149 (Ohio 1980).

The circumstances in this case are unusual.  The state appellate court first addressed the issue

as one grounded, in part, in the law of continuances, because it was the State's request for a brief continuance prior to impaneling the jury that sent the events at issue here into motion.[6]  Had the jury been impaneled and then dismissed, it would have been an issue grounded in the law of mistrial, but as Ohio appellate courts have explained, "[a] motion for a mistrial is untimely prior to the jury being impaneled.  The correct method for correcting any irregularities prior to the jury being sworn is a motion to dismiss the entire jury panel."  *State v. Trummer*, 683 N.E.2d 392, 396 (1996).

In this case, the second trial judge quashed the jury only when he was convinced that no less-extreme alternative would remedy the situation.  The record reflects that he considered alternatives to dismissing the jury,[7] requested oral argument from both parties on the issues, required the state to brief its concerns regarding the voir dire, and reviewed the record in this case. (Doc. No. 9-8 at PageID# 2123, 2126-30, 2145-54, 2160; Doc. 9-1, Exs. 21, 23.)  He succinctly but clearly reasoned his way through an "unprecedented" situation, determining that because he lacked the legal authority to review the allegations that bias or prejudice had "so pervaded the jury selection process that these proceedings must start anew," he was compelled to re-start the process in order to preserve "the parties' and the public's confidence in the integrity of the judicial system."  (Doc. No. 9-1, Ex. 24.)

Both trial judges acted reasonably with the expressed intent to maintain the integrity of the proceedings in this case.  Further, as Haywood notes, the United States Supreme Court has held that "jeopardy attaches when the jury is empaneled and sworn."  *Crist v. Bretz*, 437 U.S. 28, 36, 98 S.

---

[6]  Because, as discussed *supra*, the Petitioner conceded that the continuance was proper, those arguments will not be addressed further herein.

[7]  For example, the second trial judge considered whether the State could review each juror and remove only those who had been improperly seated. (Doc. No. 9-8 at PageID# 2145-46, 2149-52.)

Ct. 2156, 2161, 57 L. Ed. 2d 24 (1978).  The fact that this rule "reflects and protects the defendant's interest in retaining a chosen jury" does not provide grounds for abrogating it to hold that jeopardy attaches *before* the jury has been impaneled and sworn, even if voir dire is complete.  *Id.*  Therefore, there is no basis for finding an abuse of discretion on the part of either trial judge, and Haywood's protection from double jeopardy is not implicated.

**b.  Prosecutorial Misconduct**

The second issue raised in the first ground of Haywood's Petition is the allegation that the State engaged in misconduct when it accused the first trial court judge of bias in an effort "to secure a jury more favorable to its position."  (Doc. No. 19 at 7.)  He asserts that this "conclusion is bolstered by the pattern of conduct that was further demonstrated through the State's *Brady* violations during the second trial, which resulted in the State's voluntary agreement for a third trial and to recuse itself from that trial."  (*Id.*)  He argues that this pattern of behavior provides clear and convincing evidence to rebut the state appellate court's determination that the prosecution did not manipulate the proceedings or exercise tactical scheming.  (*Id.*)

The Respondent replies that the state laid out sound reasons, supported by record evidence, for seeking the disqualification of the first trial judge.  (Doc. No. 9 at 34-35.)  Although Haywood asserts that State sought an affidavit of disqualification based solely on the first trial judge's decision to uphold the *Batson* challenge of Juror 18, the Respondent asserts that this was the culmination of a pattern of behavior which justified the State's actions.  (*Id.*)

The Sixth Circuit has explained that "[p]rosecutorial misconduct can merit habeas relief only if the prosecutor's remarks render the trial so unfair as to be a denial of due process." *Moore*, 708 F.3d at 799. *See also Donnelly v. DeChristoforo*, 416 U.S. 637, 643  45, 94 S.Ct. 1868, 40 L.Ed.2d

33

431 (1974).  This is because "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)).  In order to obtain relief on a claim of prosecutorial misconduct, a petitioner "must demonstrate that the prosecution's conduct was both improper and so flagrant as to warrant reversal." *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir. 2005).

In this case, the state appellate court noted that, while it could no adjudicate the issue of whether the first trial judge was biased, "there is no evidence that the State accused the first trial judge of conduct that she did not, in fact, commit. Nor is there evidence that the State's actions amounted to tactical scheming." *Haywood*, 99 N.E.3d at 926.  The state appellate court based this determination on the fact that the State was consistent and timely in raising its concerns, sought a continuance only once and then quickly moved for an affadavit of disqualification, and did not alter its assertion that the jury had been tainted even after a new judge had been assigned to the trial.  *Id.*

Whether the State's motion for an affidavit of disqualification would ultimately have been deemed meritorious is unknowable, however, the motion was supported with record evidence and Petitioner offers no basis for finding it was pretextual.  The State explained that although it was concerned about possible bias throughout the proceedings, it was only when the first trial judge upheld the *Batson* challenge to prevent the removal of Juror 18 for a second time, after two additional African-American jurors had been seated, that the need to move for her disqualification became clear.  (Doc. No. 9 at 38.)  It does not follow, as Haywood asserts, that this renewed *Batson* challenge was the sole basis for the State's motion.  (Doc. No. 19 at 7.)  Where the State did engage in misconduct, by withholding evidence at the first trial, this was remedied with a new trial.  Further,

the fact that the second trial was held with a third jury means that, even if the State engaged in misconduct when it moved to quash the first jury and impanel the second jury, this misconduct did not render the trial so unfair as to be a denial of due process, because it was an untainted third jury that rendered the judgment at issue in this case.

Accordingly, and for all the reasons set forth above, it is recommended that the first ground of Haywood's petition, asserting abuse of discretion on the part of the trial judges and prosecutorial misconduct, be DENIED.

### V. Conclusion

For all the reasons set forth above, it is recommended that the Petition be DENIED.


Date:   November 17, 2020                           _s/ Jonathan Greenberg_____
                                                    Jonathan D. Greenberg
                                                    United States Magistrate Judge


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**

35